

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00258-CR

_____

VICTOR LAWRENCE BAXTER, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 371st District Court
Tarrant County, Texas
Trial Court No. 1694289R

---

Before Kerr, Birdwell, and Womack, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

## I. INTRODUCTION

A jury convicted Appellant Victor Lawrence Baxter of murdering his wife, Mary Baxter.[1] *See* Tex. Penal Code Ann. § 19.02.  The jury assessed his punishment at life imprisonment, and the trial court sentenced him accordingly and made an affirmative finding that family violence occurred.  In thirty-seven points on appeal,[2] Baxter complains that the trial court abused its discretion by admitting certain evidence of his past abuse of Mary (his first through thirty-sixth points) and by denying his motion for mistrial that was based on the State's argument purportedly commenting on his failure to testify at trial (his thirty-seventh point).  We will affirm.

## II. BACKGROUND

### A. Mary meets Baxter; a romantic relationship forms; Baxter begins abusing Mary.

Mary met Baxter in 2016.  Although Baxter was married to another woman at that time, he and Mary soon began a romantic relationship.  In or around June 2017, Mary moved into Baxter's home, while Baxter's then-wife moved out.  Baxter's mother, Midge, also lived in the home.  Around the time that Mary moved in, Baxter became abusive toward her.  The abuse started as verbal abuse, but it soon escalated

---

[1]In their respective briefs, both parties often refer to Appellant as "Baxter" and to his wife as "Mary."  We will do the same.

[2]To assist the reader in following our discussion of Baxter's voluminous points, we have attached a list of his thirty-seven points to this opinion.

into physical abuse. Baxter regularly told Mary that she should put him above her friends and that if he could not have her, then nobody could.

In December 2017, Mary visited her sister in Michigan. Mary's sister noted that Mary "seemed scared" and "seemed like she didn't want to go home." During that visit, Baxter called Mary "screaming at her," and he told her that if she did not come home, her cat "may not be there when she comes back." While Mary's sister had offered for Mary to stay with her in Michigan, Mary told her sister that she had to return home to her cat. Mary's sister reported that during a later visit to Michigan in March 2018, Mary seemed "[d]epressed, sad, [and] scared." During that visit, Baxter again called Mary and argued with her, telling her to "come home."

**B. Mary reports the abuse to a nurse practitioner; the nurse practitioner reports the abuse to police; police open an investigation against Baxter; Mary gives a written statement to police; Mary asks that police drop their investigation.**

Brittany Barletta, a nurse practitioner who regularly treated Mary and Baxter, testified that she was concerned by a visit she had with Mary on March 12, 2018. During that visit, Mary reported that Baxter had been physically and mentally abusive towards her and that he had taken money and medication away from her.[3] Mary indicated that she had been so distraught that she had cut herself multiple times on her left arm approximately ten days before the appointment with Barletta. Mary also

---

[3]Barletta testified that Mary took a litany of medications, including an antianxiety medication, an antidepressant medication, and a medication for chronic pain.

3

relayed that she had inflicted harm on herself as a teenager and that she sometimes had suicidal thoughts. Mary told Barletta that she had filed a police report with the North Richland Hills Police Department that morning and that she was not sure how to escape Baxter. According to Barletta, during that visit, Mary had bruising on her wrist and abdomen that was consistent with the abuse she was reporting.

Barletta saw Mary the next day—Mary was dropping off some forms—and Mary reported that she and Baxter had been involved in a physical fight the previous night and that she had hurt her right thumb. Mary told Barletta that she had a plan to leave Baxter "in about one month." Mary also indicated that she had not filed the police report that she had mentioned the previous day. When Mary left the office, Barletta called the North Richland Hills Police Department and filed a police report concerning Baxter's abuse of Mary.

Barletta's report was referred to Kristina Gonzalez, a detective working for the North Richland Hills Police Department at that time. In calls between Mary and Gonzalez on March 14 and 15, 2018, Mary told Gonzalez that she was a victim of ongoing domestic violence and that she was trying to leave Baxter. Mary stated that Baxter had a tracker on her phone and that he would be able to see if she was in contact with the police. According to Mary, Baxter made threats to prevent her from leaving the relationship, including threatening to hurt one of her male friends with whom Baxter thought she was romantically involved, to kill her cats or dump them in

4

the woods, and to tell her family about a massage business in which Baxter forced her to participate.

As to the massage business, Mary told Gonzalez that Baxter would place advertisements on Craig's List for massage appointments and that he managed the bookings. Initially, the massages did not have a sexual component, but Baxter later told Mary to engage in sexual acts with her clients. Mary told Gonzalez that she did not want to engage in sexual acts with her clients, but that Baxter had threatened her, and so she had ultimately relented.

On March 16, 2018, Mary called the emergency hotline of SafeHaven, a domestic violence shelter. During that call, Mary reported to a SafeHaven case manager that she was in a relationship with Baxter and that she had been abused by Baxter for "[t]hree to six months." Mary also told the case manager that "she had bruises on her arm and stomach, and she was swollen and had a . . . broken finger." Mary was approved for a spot in the shelter and was expected to arrive at the shelter on March 17, 2018. Mary, however, did not show up at the shelter.[4]

On March 20, 2018, Gonzalez interviewed Mary in person. During that interview, Mary told Gonzalez that Baxter's abuse started in or around February 2018 "with little things like pulling hair . . . and pushing" and that it culminated in an event on March 12, 2018, where Baxter "bumped her with his belly," grabbed her by the

---

[4]At trial, the SafeHaven case manager testified that, on average, it takes a victim of domestic violence seven attempts before the victim is able to leave the abuser.

5

hair and pulled her to the ground, and placed the palm of his hand on her neck, impeding her breathing and causing her to have chest pain. Mary explained that she was only able to get up when she "smashed her knees into his feet," and as she walked away, Baxter followed her and told her, "If I can't have you, . . . nobody can have you."

The day after she gave that interview, Mary attempted to leave Baxter, and an argument took place between them. Mary recorded a portion of that argument on her cell phone. During that argument, Mary told Baxter, "I'm not happy. You're not happy. So why should we stay unhappy together?" Throughout that argument, Baxter yelled at Mary. Mary ended up calling the police that night and telling them that Baxter had taken her suitcase and was refusing to let her leave the residence. Police officers were later able to determine that Mary had been able to travel to a friend's house for the evening.

The next day—March 22, 2018—Mary was admitted to the hospital for chest pain and shortness of breath. Baxter sent Mary a text message telling her that she had massage appointments over the next couple of days and could not afford to be in the hospital. As to what hospital staff might say about the bruising on her arm, he told her, "Please do not tell them our business Mary this is a warning I told you do not tell them our business if they ask you about the arm you tell them it's none of their business."

On March 28, 2018, Mary gave a detailed written statement to Gonzalez summarizing the information she had told Gonzalez during her previous interview. In her written statement to Gonzalez, Mary described Baxter's emotional and physical abuse of her; his pressuring her to participate in the massage business and to engage in sexual conduct with the clients; his threats to hurt her, her pets, and others; his threats to put embarrassing photographs of her on social media; his threats to tell her family about the massage business; his putting a tracking device on her vehicle; and his controlling nature.

In April 2018, Mary told Gonzalez that she wanted to withdraw her written statement and that she did not want to press charges against Baxter. Gonzalez was forced to put her investigation on hold because Mary stopped responding to her.

## C. Mary and Baxter get married; the next day, she is hospitalized.

Mary and Baxter got married on May 12, 2018.[5] The next morning, paramedics responded to a call requesting a welfare check on Mary due to a suspected drug overdose. Mary told the responding paramedic that she had "dr[u]nk some vodka and then took 20 . . . each of the medicines, which is risperidone and trazodone." Despite allegedly taking those pills, the paramedic reported that Mary's "physical health was great"; that she was "alert and oriented"; and that her "vital signs were all within limits." Mary requested to be taken to the hospital. That same day, Mary was

---

[5]Baxter and his previous wife were divorced in March 2018.

admitted as an emergency detention to the psychiatric emergency department of the hospital. One of Mary's friends testified at trial that Mary had previously discussed a plan with her to get away from Baxter by checking herself into a "rehab facility or a hospital," and Mary later told the friend that she had checked herself into the hospital after her wedding to "get her head clear." After being at the hospital for three days, Mary returned to Baxter.

**D. Further incidents in June 2018, October 2018, and November 2018.**

In June 2018, North Richland Hills police responded to a family disturbance call at Baxter and Mary's home. Baxter told the responding officer that Mary was not "doing her wifely duties," and so he took her wedding ring and put it in a safe. Both Baxter and Mary told the officer that they had then started arguing, that Mary was holding a knife, that she moved it, and that Baxter's finger got cut. Mary was ultimately arrested and charged with aggravated assault with a deadly weapon. Baxter did not want Mary to be arrested. A grand jury later declined to indict Mary relating to that incident.

In October 2018, Mary went to the emergency room complaining of a "headache and neck pain after a fall four days ago." The emergency room nurse noted that Baxter "broke into conversation" between herself and Mary regarding the fall and said Mary "will not be admitted or staying in the hospital." The nurse continued her assessment but was concerned that Baxter might be abusing Mary— "husband was doing the majority of the talking regarding how patient was injured, she

never made eye contact to anyone when she was spoken to, her demeanor was severely demure and would immediately defer to her husband when answering questions, slash, concerns, bruises on her right arm that do not match her report of her fall on Friday." Later, the nurse was able to speak to Mary outside of Baxter's presence, and Mary stated that Baxter was verbally abusive but that he did not hit her. That same month, Mary again visited the hospital, complaining about a cut on her neck that she claimed was from a Christmas decoration. Hospital staff did not believe that the injury matched Mary's story.

In November 2018, Baxter called 911 after he woke up and discovered that Mary was not home. He reported that "weeks earlier," Mary had "cut her legs . . . in an attempt to hurt herself," and that he wanted her to go to the hospital. While on the phone with a police dispatcher, Mary returned home. Baxter told the responding police officer that he wanted to have Mary committed; although Mary was cooperative with the decision to take her to the hospital, the responding officer ultimately decided to take Mary to the hospital as an emergency mental detention. Mary was ultimately discharged from the hospital because she did not meet the criteria for emergency mental detention.

## E. Mary's attempt to adopt a cat the day before her death; Baxter's anger when Mary is unable to return the cat.

On March 10, 2019, Mary and Baxter went to a pet store in North Richland Hills, where they adopted a cat.[6]  Later that day, Mary came back to the store to return the cat.  According to an employee of the store, Mary was visibly upset, explaining that she needed to return the cat because it did not get along with another cat in her home.  Mary was told by the store's staff that she could not return the cat to the store but that she needed to return it to the animal shelter that had provided the cat to the store.  Mary—who, according to staff of the store, seemed hesitant to return home— left the store with the cat.  When Mary returned from the pet store with the cat, an argument ensued with Baxter.  That same day, an "incredibly angry" Baxter called the pet store to complain about its refusal to take the cat back and called a store employee a "b****."

## F. Baxter's call to 911 reporting Mary's death; law enforcement's investigation into Mary's death.

Around 1:19 a.m. on March 11, 2019, Baxter called 911 and told the dispatcher that he thought that Mary had killed herself.  Baxter volunteered to the dispatcher that Mary had a history of mental illness and a history of overdosing on pills.  He told the dispatcher that he had gone to bed before Mary and that he had woken up—around ten minutes before the call to the dispatcher—and found Mary on the floor.  He also

---

[6]Staff of the pet store observed that Mary had bruising around her eyes when she came into the store.

said that Mary had a history of violence and drinking and that he had "just found a whole bottle, empty, in the trashcan." Law enforcement personnel from the North Richland Hills Police Department—including Ryan Abbott, Jennie Espy, and Brian Goen—responded to the call.

Abbott, a police officer who was assigned to patrol in March 2019, arrived at Baxter's home shortly after Baxter's 911 call. When entering the home, Abbott observed that Mary was lying facedown on the floor of the master bedroom. Abbott also observed that the home contained lots of cameras, along with a massage table and signs associated with the massage business. According to Abbott, Baxter's response to Mary's death was unusual.[7] Baxter told Abbott about Mary's "mental health and alcohol problems," about "how aggressive she [was]," about "her medical problems," and stated that "he hoped it wasn't suicide because then he wouldn't get a life insurance payout."

Espy, a crime scene investigator, arrived at Baxter's home around 1:36 a.m. After arriving at the scene, Espy observed Mary facedown on the floor of the master bedroom, "sort of rolled to her side," and wearing only her underwear. Mary also had a blood pressure cuff around one of her arms.[8] Espy noticed that Mary had "two

---

[7]Abbott stated, "I've seen a lot of different responses to deaths. I have not seen this type of response before and still haven't to this day."

[8]Baxter told Espy that he had placed the blood pressure cuff on Mary to check for a pulse, which stood out to Espy because "[i]t's just not something that somebody normally does."

11

black eyes . . . and some bruising to her arms and her legs." Baxter attempted to explain Mary's black eyes and bruising to Espy; he asserted that Mary had been drinking excessively the previous evening and had "fallen into the door." Espy testified that Baxter's explanation was not consistent with Mary's injuries. According to Espy, Baxter was "very much stressing" that Mary had been drinking excessively, and Baxter was "very adamant about pointing out a bottle of vodka that was in the garbage can in the kitchen." Espy testified that she was "feeling suspicious" as she walked around the house; she noted that Baxter and Midge—Baxter's mother—did not cry or express concern for Mary's death. Because Mary's death did not appear to be a natural death, Espy called Goen, a homicide detective, to the scene.

Goen arrived at Baxter's home around 3:00 a.m. Goen spoke to both Baxter and Midge at the scene. According to Goen, Baxter's demeanor seemed "very off."[9] Baxter told Goen that he had gone to bed at approximately 6:00 p.m. the prior evening and that Mary had not gone to bed with him. Baxter stated that at one point he had woken up to find Mary—who was snoring "unusually loud"—in bed next to him; that he had gone back to sleep and had later woken up and realized that Mary was not next to him; that he had gone back to sleep again and later woken up to use the bathroom; and that upon realizing that Mary was still not in bed, he had gone to look for her and found her on the floor on her side of the bed.

---

[9]For example, Goen noted that Baxter was "completely dressed, shoes on, shoes tied," which seemed suspicious to Goen given the circumstances.

According to Goen, Baxter was "very insistent" that Mary's death was caused by her abuse of alcohol and prescription medications. Baxter was also "very insistent" that officers observe an empty bottle of vodka that was in a trash can in the home's kitchen. As to the bruising found on Mary, Baxter told Goen that Mary would "typically fall and hit her head on the floor . . . due to her high levels of intoxication." Baxter also told Goen that Mary was a "violent person" and that she had "mental health problems."

Baxter told Goen to call the company that provided service for his CPAP machine;[10] he claimed that his machine would verify the hours that he had been asleep while the machine was in use. According to Goen, Baxter was insistent that his CPAP machine would corroborate that he was asleep "from approximately 6:00 [p.m.] until he basically got up and found [Mary]." Records pertaining to his CPAP machine, however, reflect that it had less than two hours of usage on March 10, 2019, and no usage on March 11, 2019.

During Goen's conversation with Midge, Midge told Goen that she had heard snoring coming from the master bedroom and that it was "unusually loud." Midge also said that Baxter had called her and told her that Mary was dead. Midge also told Goen that Mary was the "violent one" and that Mary was "always causing problems."

---

[10]A CPAP machine is a device used to treat sleep apnea. *See In re Union Pacific R.R. Co.*, 459 S.W.3d 127, 128 (Tex. App.—El Paso 2015, orig. proceeding).

She told Goen that he would find bruises on Baxter's body to substantiate Mary's violent behavior; Goen, however, found no bruises on Baxter.

During a later interview, Baxter told Goen that he had taken several pills on March 10, 2019, and that he would not have been able to wake up. Goen testified that when he saw Baxter in the early morning hours of March 11, 2019, Baxter did not seem to be under the influence of any medication that would have made it difficult for Baxter to move around. Explaining the bruising to Mary's face, Baxter told Goen that he had previously "put [Mary] down" by putting his hands around her neck.

During the investigation of Mary's death, police also discovered that in February 2019, Baxter had performed the following internet searches: "[C]an you use drinking alcohol as an excuse to hurt somebody[?]" and "[C]an you use alcohol as rescues [sic] for doing something bad to somebody[?]"

## G. The results of Mary's autopsy; the medical examiner's determination that Mary's cause of death was asphyxia by strangulation and that the manner of her death was homicide.

Tasha Greenberg, the deputy chief medical examiner for the Tarrant County Medical Examiner's Office, performed an autopsy on Mary. During the autopsy, Greenberg observed bruising around Mary's forehead, eyes, upper-cheek area, jawline, neck, shoulders, right breast, arms, wrists, several fingers, left buttocks, left leg, left knee, left ankle, and several toes. Greenberg indicated that the bruising around Mary's neck was evidence of asphyxia. She also stated that Mary had petechiae—small pinpoint areas of hemorrhage where small blood vessels had ruptured—present

14

on Mary's neck, face, and in her eyes, which was also consistent with asphyxia. During an internal examination of Mary, Greenberg observed several layers of deep hemorrhaging to the structures within Mary's neck, another sign of asphyxia. Greenberg determined that Mary's cause of death was asphyxia by strangulation and that the manner of Mary's death was homicide.

Mary's autopsy revealed that she had a blood alcohol concentration of 0.034 around the time of her death.[11] Mary also had the following drugs in her system at the time of her death: hydrocodone, codeine, diazepam, nordazepam, chlordiazepoxide, alprazolam, cyclobenzaprine, citalopram, and gabapentin. Baxter's expert witness, Amy Gruszecki, a forensic pathologist, testified that the hydrocodone in Mary's system at the time of her death was above the "lethal level."[12] In contrast, Greenberg testified that the level of hydrocodone in Mary's system was "slightly above the therapeutic, or nontoxic, range."[13] Greenberg stated that someone who had used hydrocodone frequently in the past could "certainly live through" taking the amount of hydrocodone that Mary had in her system. Greenberg opined that she "did not

---

[11]Greenberg testified that Mary's blood alcohol concentration was not consistent with Baxter's claim that Mary had drunk an entire bottle of vodka but that it was "far more consistent" with Mary having had "[a] couple of drinks."

[12]Gruszecki explained that the "lethal level" is "the level that will absolutely cause a death."

[13]As to that level, Greenberg stated that Mary had "311 nanograms per milliliter" of hydrocodone in her system.

15

believe that this was a drug overdose and certainly did not see that the levels of medication were suggestive of an intentional over-ingestion of medication."[14] Greenberg also stated that her review of Mary's toxicology results did not change her impression of the manner and means of Mary's death—homicide caused by asphyxia by strangulation.[15]

## III. DISCUSSION

### A. Baxter's evidentiary complaints

In his first through thirty-sixth points, Baxter complains that the trial court abused its discretion by admitting certain evidence during the guilt–innocence stage of his trial. We will begin our analysis of these points by discussing the standard of review applicable to a trial court's admission of evidence. We will then analyze these points in four broad groupings: (1) Baxter's complaints under Texas Code of Criminal Procedure Articles 38.36(a) and 38.371; (2) Baxter's complaints under Texas Rule of Evidence 404(b); (3) Baxter's complaints under Texas Rule of Evidence 403; and (4) Baxter's confrontation complaints under the Sixth Amendment of the United

---

[14]As to the drugs in Mary's system other than hydrocodone, Greenberg stated that the levels of those drugs were all inside of the therapeutic range.

[15]Mary's sister testified that Mary had been "born with a hole in her heart," which necessitated Mary having surgery later in life to install a mechanical valve replacement. Greenberg testified that Mary's mechanical valve appeared to be functional at the time of Mary's death and that there was no indication that the valve had failed.

16

States Constitution and Article I, Section 10 of the Texas Constitution, along with his hearsay complaints.

### 1. Standard of review

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018). Under that standard, the trial court's decision to admit or exclude evidence will be upheld as long as it was within the "zone of reasonable disagreement." *Id.* If the trial court's evidentiary ruling is correct on any applicable theory of law, we will not disturb it. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

### 2. Baxter's complaints under Articles 38.36(a) and 38.371

In his first point, Baxter argues that the trial court abused its discretion by admitting relationship evidence under Texas Code of Criminal Procedure Articles 38.36(a) and 38.371.[16] *See* Tex. Code Crim. Proc. Ann. arts. 38.36(a), 38.371.

---

[16]In his second point, Baxter states that the trial court erred by admitting relationship evidence under Article 38.371 over his due process objection that Article 38.371 is unconstitutional as applied to him. The argument section of his brief, however, contains no argument relating to this point, nor does his brief contain any authority to suggest that Article 38.371 is unconstitutional as applied to him. To assert an issue on appeal, an appellant's brief "must contain a clear and concise argument for the contentions made, with appropriate citations to authorities." Tex. R. App. P. 38.1(i). An appellant waives an issue on appeal if he does not adequately brief that issue by providing supporting arguments, substantive analysis, and appropriate citations to the authorities supporting the issue. *Adell v. State*, No. 01-21-00439-CR, 2023 WL 4938111, at *40 (Tex. App.—Houston [1st Dist.] Aug. 3, 2023, no pet.) (mem. op., not designated for publication). Because Baxter's brief contains no argument to support his claim that Article 38.371 is unconstitutional as applied to him, nor does it cite any authorities in support of that claim, we hold that he has

17

Article 38.36(a) provides,

> In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.

Tex. Code Crim. Proc. Ann. art. 38.36(a). The nature of a relationship—such as whether the victim and the accused were married, estranged, separated, or divorced—is "clearly admissible under this Article." *Garcia v. State*, 201 S.W.3d 695, 702 (Tex. Crim. App. 2006). Prior acts of violence between the victim and the accused may be offered to illustrate the nature of the relationship. *Id.* These specific acts of violence must meet the requirements of the Texas Rules of Evidence—including Rules 403 and 404(b)—in order to be admissible. *Id.*; *Jackson v. State*, No. 02-11-00414-CR, 2012 WL 6049074, at *3 (Tex. App.—Fort Worth Dec. 6, 2012, pet. ref'd) (mem. op., not designated for publication).

Article 38.371, which applies to family violence prosecutions, expressly allows "evidence of all relevant facts and circumstances that would assist the trier of fact in determining whether the actor committed the offense . . . , including testimony or

waived that complaint. *See Cardenas v. State*, 30 S.W.3d 384, 393 (Tex. Crim. App. 2000) (holding an appellant waives an issue on appeal if he does not adequately brief that issue, i.e., by presenting supporting arguments and authorities); *Adell*, 2023 WL 4938111, at *40. We note that during oral argument in this case, Baxter's counsel conceded that Baxter had inadequately briefed his second point. Accordingly, we overrule Baxter's second point.

evidence regarding the nature of the relationship" between the victim and the defendant. Tex. Code Crim. Proc. Ann. art. 38.371(b). "Thus, Article 38.371(b) expressly provides for the admission of extraneous[-]offense evidence regarding the nature of the relationship between [the victim and the defendant]." *Gaulding v. State*, No. 02-21-00096-CR, 2022 WL 17986026, at *4 (Tex. App.—Dec. 29, 2022, pet. ref'd) (mem. op., not designated for publication) (first citing *James v. State*, 623 S.W.3d 533, 546 (Tex. App.—Fort Worth 2021, no pet.); and then citing *Mourning v. State*, No. 02-19-00168-CR, 2020 WL 6165309, at *4–5 (Tex. App.—Fort Worth Oct. 22, 2020, no pet.) (mem. op., not designated for publication)). The evidence, however, must still be otherwise admissible under the Texas Rules of Evidence—including Rules 403 and 404(b)—in order to be admitted. *Emich v. State*, No. 02-18-00059-CR, 2019 WL 311153, at *6 (Tex. App.—Fort Worth Jan. 24, 2019, pet. ref'd) (mem. op., not designated for publication); *see Payne v. State*, No. 02-17-00268-CR, 2019 WL 2223575, at *2 (Tex. App.—Fort Worth May 23, 2019, no pet.) (mem. op., not designated for publication) ("[T]he admission of evidence under [Article 38.371] does not allow admission of evidence that is proffered solely to show character conformity or that otherwise violates the [R]ules of [E]vidence.").

Thus, because our analysis of the admission of the relationship evidence under Articles 38.36(a) and 38.371 hinges on whether that evidence violates Rules 403 and 404(b), we turn to Baxter's complaints pertaining to those rules before making our holding with respect to his first point.

19

### 3. Baxter's Rule 404(b) complaints

Baxter raises nine points complaining that the trial court's admission of certain relationship evidence violated Rule 404(b) because it was not relevant apart from character conformity. *See* Tex. R. Evid. 404(b). Specifically, he complains about the admission of the following evidence:

- Mary's written statement to Gonzalez (third point);

- Mary's recorded interview with Gonzalez (seventh point);

- A SafeHaven screening document describing Mary's March 16, 2018 call to the shelter (eleventh point);

- Mary's responses to a domestic violence checklist[17] (fifteenth point);

- Mary's outcry to Barletta and Mary's medical records (nineteenth point);

- Mary's statements to and text messages with Gonzalez (twenty-third point);

- Mary's text messages with Baxter[18] (twenty-seventh point);

- Photographs of Mary's injuries from Baxter's prior abuse (thirty-first point); and

---

[17]Those responses indicated that Baxter had been violent to Mary in the past; had threatened to kill her; had choked her; had forced her to have sex with others against her will; and had been violent toward her pets.

[18]These text messages included the message sent by Baxter to Mary at the hospital on March 22, 2018, where he told her not to tell hospital staff about the bruising to her arm. The text messages also reflected that in the days leading up to Mary's death, Baxter told Mary that he was "super pissed" at her, that she was an "ungr[a]teful[] piece of work," that "there's no love in [him] for [her]," that she was "evil," that he was "very unhappy with [his] life [a]nd [his] wife"; that he was "done" with her; and that she was a "snake."

20

- Mary's recorded conversation with Baxter on March 21, 2018, when she tried to leave him (thirty-third point).

### a. Applicable law

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Tex. R. Evid. 401. Relevant evidence is generally admissible. Tex. R. Evid. 402. Rule 404(b)(1), however, precludes the admission of evidence of a crime, wrong, or act solely to prove a person's character to show that he acted in conformity with that character on a particular occasion. Tex. R. Evid. 404(b)(1). Rule 404(b)(2) allows for such evidence to be admitted for other purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Tex. R. Evid. 404(b)(2).

The purposes listed in Rule 404(b)(2) "are neither mutually exclusive nor collectively exhaustive." *De La Paz*, 279 S.W.3d at 343. Indeed, extraneous evidence may also be introduced to rebut a defensive theory. *Robbins v. State*, 88 S.W.3d 256, 259 (Tex. Crim. App. 2002); *Richardson v. State*, 328 S.W.3d 61, 71 (Tex. App.—Fort Worth 2010, pet. ref'd) (per curiam). Thus, while Rule 404(b) limits character evidence, it is nevertheless a rule of inclusion. *De La Paz*, 279 S.W.3d at 343; *Gaulding*, 2022 WL 17986026, at *4.

### b. Analysis

Contrary to Baxter's assertion that the complained-of evidence was introduced to show character conformity, the State made it clear at a pretrial evidentiary hearing that it was offering the complained-of evidence to show the relationship between Mary and Baxter, as well as to show Baxter's intent, the lack of mistake, and the lack of accident concerning her death. The trial court agreed with the State, overruling Baxter's Rule 404(b) objection.

We also agree with the State that the complained-of evidence was introduced to show the relationship between Mary and Baxter, a non-character-conformity purpose. In this regard, the complained-of evidence—which reflected past instances of domestic violence between Baxter and Mary and his controlling demeanor over her and her fear of him—gave the jury important insight into the nature of their violent and volatile relationship. *See Gaulding*, 2022 WL 17986026, at *4 (holding that prior incidents of domestic violence between defendant and victim were admissible under Article 38.371 and Rule 404(b)); *James*, 623 S.W.3d at 545 ("Article 38.371, which applies to family-violence prosecutions, provides another non-character-conformity purpose for admitting extraneous-offense evidence."); *Mourning*, 2020 WL 6165309, at *5 ("[The defendant's] history of drug use—and [the victim's]—gave the jury insight into the nature of their volatile relationship."). Because the complained-of evidence showed the nature of Baxter and Mary's relationship, it was admissible for that purpose under Articles 38.36(a) and 38.371, as well as Rule 404(b). *See* Tex. Code

22

Crim. Proc. Ann. arts. 38.36(a), 38.371; Tex. R. Evid. 404(b); *James*, 623 S.W.3d at 546 ("All the extraneous-offense evidence James complains of shows the nature of his relationship with [the victim] and was admissible under Article 38.371(b) and Rule 404(b) on that basis.").

We also agree with the State that the complained-of evidence was introduced to show Baxter's intent, the lack of mistake, and the lack of accident regarding Mary's death. In this regard, the central issue in this case was whether Mary died from Baxter's hands or whether she died from some other method, such as a drug overdose. The complained-of evidence showed the violent and volatile relationship between Baxter and Mary and strongly served to demonstrate Baxter's intent to kill Mary and the lack of mistake and lack of accident concerning her death. *See Norvell v. State*, No. 06-21-00051-CR, 2022 WL 1509299, at *7 (Tex. App.—Texarkana May 13, 2022, no pet.) (mem. op., not designated for publication) ("The extraneous-offense evidence showed the intimidating nature of the relationship between [the defendant] and [the victim] and strongly served to make more probable the existence of the required *mens rea*."); *Smith v. State*, 314 S.W.3d 576, 592 (Tex. App.—Texarkana 2010, no pet.) (holding that evidence of defendant's prior assault and interactions with victim in months preceding her death was admissible relationship evidence relevant to show defendant's intent in killing victim, as well as absence of mistake and accident concerning her death). Because the complained-of evidence showed Baxter's intent, the lack of mistake, and the lack of accident regarding her death, it was admissible

23

under Rule 404(b). *See Norvell*, 2022 WL 1509299, at \*7 ("Because extraneous offenses are admissible to show intent under Rule 404(b)(2) . . . the trial court . . . did not abuse its discretion in overruling [the defendant's] Rule 404(b) objection."); *Smith*, 314 S.W.3d at 592 (holding that because extraneous-offense evidence was "introduced for a purpose other than character conformity, had relevance to intent, absence of mistake, and the nature of the relationship between [the defendant and the victim] . . . it was admissible").

Moreover, one of Baxter's defensive theories was that Mary died as a result of a drug overdose (whether by accident or suicide). Indeed, during Baxter's opening statement, his trial counsel told the jury, "The evidence will show this was not a strangulation. This was a suicide that Mary finally completed." That theory was advanced through Baxter's cross-examination of the State's witnesses and through his own witnesses. It was further advanced during his closing argument, where his trial counsel brought up Gruszecki's testimony that the hydrocodone in Mary's system was at the "lethal level." Thus, the complained-of evidence was also admissible under Rule 404(b) to rebut the defensive theory that Mary died by a drug overdose. *See Cabello v. State*, No. 13-19-00341-CR, 2022 WL 3451368, at \*23 (Tex. App.—Corpus Christi–Edinburg Aug. 18, 2022, no pet.) (mem. op., not designated for publication) ("[I]t is at least subject to reasonable disagreement whether the extraneous[-]offense evidence was admissible for the noncharacter-conformity purpose of rebutting appellant's defensive theory. . . . The trial court thus did not abuse its discretion in

24

deciding that the extraneous[-]offense evidence was relevant."); *Emich*, 2019 WL 311153, at *6 ("[W]e hold that the complainant's testimony about the history of abuse was admissible under [R]ule 404(b) to rebut that defensive evidence.").

Because the complained-of evidence was admissible as relationship evidence, as evidence to show Baxter's intent, the lack of mistake, and the lack of accident regarding Mary's death, and to rebut Baxter's defensive theory that Mary died because of a drug overdose, we hold that the trial court did not abuse its discretion by overruling Baxter's Rule 404(b) objection. We overrule Baxter's third, seventh, eleventh, fifteenth, nineteenth, twenty-third, twenty-seventh, thirty-first, and thirty-third points.

### 4. Baxter's Rule 403 complaints

Baxter raises nine points complaining that the trial court's admission of certain evidence violated Rule 403 because the probative value of the evidence was outweighed by the unfair prejudice of the evidence. *See* Tex. R. Evid. 403. Specifically, he complains about the admission of the following evidence:

- Mary's written statement to Gonzalez (fourth point);

- Mary's recorded interview with Gonzalez (eighth point);

- A SafeHaven screening document describing Mary's March 16, 2018 call to the shelter (twelfth point);

- Mary's responses to a domestic violence checklist (sixteenth point);

- Mary's outcry to Barletta and Mary's medical records (twentieth point);

25

- Mary's statements to and text messages with Gonzalez (twenty-fourth point);

- Mary's text messages with Baxter (twenty-eighth point);

- Photographs of Mary's injuries from Baxter's prior abuse (thirty-second point); and

- Mary's recorded conversation with Baxter on March 21, 2018, when she tried to leave him (thirty-fourth point).

### a. Applicable law

Under Rule 403, a trial court may exclude relevant evidence if the probative value of the evidence "is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." *Id.*; *see Emich*, 2019 WL 311153, at *7.

"Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence is more probative than prejudicial." *James*, 623 S.W.3d at 546–47 (first citing *Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 1990) (op. on reh'g); and then citing *Emich*, 2019 WL 311153, at *7). Thus, the balance in evaluating the admission of evidence under Rule 403 "is always slanted toward admission of relevant evidence." *Fernandez v. State*, No. 02-18-00483-CR, 2020 WL 1057323, at *6 (Tex. App.—Fort Worth Mar. 5, 2020, pet. ref'd) (mem. op., not designated for publication) (citing *De La Paz*, 279 S.W.3d at 343 & n.17). Because of this presumption, it is the burden of the party opposing the admission of the evidence to show that the evidence's probative value is substantially outweighed by one or more

of the dangers listed in Rule 403. *Gaulding*, 2022 WL 17986026, at *5; *James*, 623 S.W.3d at 547.

To determine whether evidence is admissible in the face of a Rule 403 objection, the trial court must conduct a balancing test. *Montgomery*, 810 S.W.2d at 389; *see Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006). The Texas Court of Criminal Appeals has instructed that when undertaking a Rule 403 analysis, courts must balance the following factors (the *Gigliobianco* factors): (1) the inherent probative force of the proffered item of evidence and (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest a decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency that a jury that has not been equipped to evaluate the probative force of the evidence would give it undue weight, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco*, 210 S.W.3d at 641–42.

### b. Analysis

As to the first *Gigliobianco* factor—the inherent probative force of the proffered evidence—we conclude that the evidence was highly probative to show Baxter's relationship with Mary; to show his intent, the lack of mistake, and the lack of accident regarding her death; and to rebut his defensive theory that she died because of a drug overdose. As discussed above during our analysis of Rule 404(b), the ultimate issue in this case surrounded whether Baxter killed Mary or whether she died

by some other method, such as a drug overdose. Thus, the complained-of evidence—which reflected past instances of domestic violence between Baxter and Mary and his controlling demeanor over her and her fear of him—was highly probative. *See Gaulding*, 2022 WL 17986026, at *5 ("[T]he evidence's inherent probative force was strong because it provided context and insight into [the defendant's] motivation for striking the complainant and showed how the abuse had escalated over time."); *James*, 623 S.W.3d at 548 (holding that "the probative value of the extraneous-offense evidence was strong" where it "was probative of the nature of [the defendant's] abusive relationship with [the victim]" and it "rebut[ted] the defensive theory of fabrication"). This factor weighs in favor of the admission of the complained-of evidence.

As to the second *Gigliobianco* factor—the proponent's need for the evidence—we note that no eyewitnesses testified as to how Mary died. In the absence of such eyewitness testimony, the need for the complained-of evidence was high to support the State's theory that Mary died at Baxter's hands rather than by some other method. *See James*, 623 S.W.3d at 548 ("The State also had a strong need for the extraneous-offense evidence because no one witnessed the charged offenses."); *Emich*, 2019 WL 311153, at *7 (holding that State had need for complained-of extraneous evidence because "nobody saw what actually happened" between victim and defendant and because victim "could not remember the details of how or with what [the defendant] hit her"); *McGregor v. State*, 394 S.W.3d 90, 122 (Tex. App.—Houston [1st Dist.] 2012,

pet. ref'd) (holding that State had need for evidence—thus favoring admissibility of complained-of extraneous evidence—where there were no eyewitnesses to the subject murder). This factor weighs in favor of the admission of the complained-of evidence.

As to the third through fifth *Gigliobianco* factors—any tendency of the evidence to suggest a decision on an improper basis, any tendency of the evidence to confuse or distract the jury, and any tendency that a jury that has not been equipped to evaluate the probative force of the evidence would give it undue weight—we note that the trial court gave the jury the following limiting instruction,

> You are instructed that if there is any testimony before you in this case regarding the Defendant's having committed a crime, wrong or act other than the offense alleged against him in the Indictment in this case, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the Defendant committed such other crime, wrong or act, if any were committed, and even then you may only consider the same in determining the motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident of the Defendant, if any, in connection with the offense, if any, alleged against him in the Indictment or in determining the nature of the relationship of the parties, and for no other purposes.

We are to presume that the jury followed the trial court's instruction. *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005). Although this presumption is rebuttable, an appellant has the burden to refute it by pointing to evidence that the jury failed to follow the trial court's instructions. *Id.* Here, Baxter has not pointed to any evidence that demonstrates that the jury failed to follow the trial court's limiting instruction. *See Gaulding*, 2022 WL 17986026, at *6 ("These instructions—which we presume the jury followed—equipped the jury to weigh the extraneous[-]offense

29

evidence properly and minimized the risk of the jury's improperly relying on such evidence in reaching its verdict.") (citation omitted); *Graves v. State*, No. 02-15-00141-CR, 2015 WL 9244767, at *2 (Tex. App.—Fort Worth Dec. 17, 2015, pet. ref'd) (mem. op., not designated for publication) (rejecting argument that jury would be confused by evidence or would use it for an improper purpose where trial court gave limiting instruction and appellant did not suggest that jury failed to follow instruction).

Further, we note that the wrongful acts contained in the complained-of evidence were no more heinous than the charged offense—Baxter's murder of Mary. Thus, the risk of unfair prejudice was relatively low. *See Gaulding*, 2022 WL 17986026, at *7 ("[B]ecause the extraneous offenses were no more heinous than the charged offenses, the risk of unfair prejudice was relatively low."); *Norwood v. State*, No. 03-13-00230-CR, 2014 WL 4058820, at *5 (Tex. App.—Austin Aug. 15, 2014, pet. ref'd) (mem. op., not designated for publication) ("When the extraneous offense is no more heinous than the charged offense, evidence concerning the extraneous offense is unlikely to cause unfair prejudice."); *see also James*, 623 S.W.3d at 549 (holding that third *Gigliobianco* factor weighed in favor of admission of extraneous-offense evidence that was "not more heinous than the charged offenses" but against admission of extraneous-offense evidence that was more heinous than the charged offenses); *Smith*, 314 S.W.3d at 593 (holding that "[t]here is nothing in the record to indicate [the defendant's] prior bad acts would 'lure the factfinder into declaring guilt on a ground

different from proof specific to the offense charged' in this murder case, especially given the trial court's lengthy Rule 403 limiting instruction").

Moreover, we note that the complained-of evidence was not scientific in nature, nor was it overly complex; thus, there was little risk of jury confusion. *See Gaulding*, 2022 WL 17986026, at *6 ("[B]ecause the evidence was not scientific or complex, there was little risk of jury confusion."); *James*, 623 S.W.3d at 550 ("Our review of the record shows that the extraneous-offense testimony was from lay witnesses, not experts, and it described the various abusive incidents in a factual manner. None of the extraneous-offense evidence was scientific or complex."). These factors weigh in favor of the admission of the complained-of evidence.

As to the sixth *Gigliobianco* factor—the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted—Baxter complains that the complained-of evidence "consumed an inordinate amount of trial time," mentioning that "approximately 70% of the testimony" focused on "past domestic abuse and violence."[19] The State concedes that "the presentation of extraneous[-]offense testimony did consume a large portion of time at Baxter's trial" and that "[t]his factor weighs in favor of exclusion." We agree that the complained-of evidence consumed an inordinate amount of time at Baxter's trial. This factor weighs against the admission of the complained-of evidence. *See*

---

[19]During oral argument in this case, the State conceded that "about 30% [of the trial testimony] was on the . . . charged offense and about 70% . . . was extraneous."

*James*, 623 S.W.3d at 551 (holding that sixth *Gigliobianco* factor weighed against admission of extraneous evidence where "only three of the State's ten witnesses did not offer extraneous-offense evidence").

Balancing all six of the *Gigliobianco* factors, we hold that the trial court did not abuse its discretion by determining that the probative value of the complained-of evidence was not substantially outweighed by the risk of "unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. Five out of the six *Gigliobianco* factors favor admission of the complained-of evidence. In this regard, even though the complained-of evidence certainly had the potential to sway the jury to improperly convict Baxter based on character conformity, the probative value of the complained-of evidence was strong, the State's need for it was high, the risk of unfair prejudice was relatively low, and any risk was minimized by the trial court's limiting instruction. *See Gaulding*, 2022 WL 17986026, at *7 (holding that trial court did not abuse its discretion by admitting extraneous-offense evidence where "the probative value of the evidence was strong . . . the risk of unfair prejudice was relatively low" and the "risk was further minimized by the trial court's limiting instruction"); *James*, 623 S.W.3d at 551 (holding that trial court did not abuse its discretion by admitting complained-of evidence where "[f]ive out of the six *Gigliobianco* factors favor[ed] admission of the similar extraneous-

32

offense evidence, and four of the six factors favor[ed] admission of the evidence of rape, sodomy, torture, and unlawful restraint").[20]

### c. Harm

Even if we assumed that the trial court abused its discretion by admitting the complained-of evidence, the record does not establish harm. Error in the admission of evidence in violation of Rule 403 is generally not constitutional error. *Perez v. State*, 562 S.W.3d 676, 691 (Tex. App.—Fort Worth 2018, pet. ref'd). Because the error is not constitutional, we apply Rule 44.2(b). Tex. R. App. P. 44.2(b). That Rule requires

---

[20]Baxter relies heavily on *Upchurch v. State*, 656 S.W.3d 170 (Tex. App.—Fort Worth 2022, no pet.) to support his argument that the admission of the complained-of evidence violated Rule 403. There, the defendant was charged with assault of a family member after he hit his wife in the head with his hand. *Id.* at 174–75. At his trial, the State introduced evidence of the defendant's prior aggravated assault of his wife—who was his girlfriend at the time of that assault—showing that on that occasion, the defendant had poured gasoline over his wife and her car, had lit her and the car on fire, and had then shut the car door with her inside of it. *Id.* at 175. The State also introduced photographs of his wife showing her "badly burned, bandaged, and bleeding body in the aftermath of the fire" and heard a "chilling moment-by-moment account of the aggravated assault by fire from the victim herself," including testimony about the horrible pain caused by the burns. *Id.* at 181. Applying the *Gigliobianco* factors, we held that the trial court abused its discretion by admitting evidence of the prior aggravated assault over the defendant's Rule 403 objection. *Id.* at 182. In reaching that conclusion, we noted that "the danger of unfair prejudice to [the defendant] was as high as we c[ould] fathom, and the presentation of this evidence consumed an inordinate amount of time at trial." *Id.* While the evidence here also consumed an inordinate amount of time at Baxter's trial, the wrongful acts mentioned in the complained-of evidence—prior instances of domestic violence—paled in comparison to the charged act—Mary's murder. The opposite was true in *Upchurch*. There, the charged act—an assault where the defendant hit his wife in the head with his hand—paled in comparison to the wrongful act mentioned in the complained-of evidence—an aggravated assault where the defendant set his wife on fire. We thus find *Upchurch* to be distinguishable.

us to disregard any nonconstitutional error that does not affect the appellant's substantial rights. *Id.* A substantial right is affected when the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Haley v. State*, 173 S.W.3d 510, 518 (Tex. Crim. App. 2005); *see King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)). Conversely, an error does not affect a substantial right if the appellate court has a fair assurance from an examination of the record as a whole that the error did not influence the jury or that it had but a slight effect. *Macedo v. State*, 629 S.W.3d 237, 240 (Tex. Crim. App. 2021). In deciding that question, we consider (1) the character of the alleged error and how it might be considered in connection with other evidence, (2) the nature of the evidence supporting the verdict, (3) the existence and degree of additional evidence indicating guilt, and (4) whether the State emphasized the complained-of error. *Id.*; *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).

While the State emphasized Baxter's prior abuse of Mary throughout the trial, we note that there was also strong evidence indicating Baxter's guilt for murder. In this regard, Greenberg—the medical examiner—testified that Mary had died from asphyxia by strangulation. Greenberg noted several factors in support of that conclusion, including bruising to Mary's neck, the presence of petechiae, and deep hemorrhaging to the structures within Mary's neck. It is undisputed that Mary and Baxter were the only individuals in the master bedroom of the home around the time

34

of Mary's death, and the two of them had been in an argument the previous day and Baxter had been "incredibly angry."

Mary's body also showed signs of recent abuse, and Baxter's explanation for her injuries was inconsistent with those injuries. Baxter also indicated to Goen that he had previously "put [Mary] down" by putting his hands around her neck. Baxter's assurance that his CPAP machine would corroborate his statement that he was asleep from approximately 6:00 p.m. until he found Mary's body was belied by the records from the machine, which showed that it had less than two hours of usage on March 10, 2019, and no usage on March 11, 2019. Finally, law enforcement responding to the scene noted that Baxter's demeanor was "very off"—that he did not seem bereaved by Mary's death but instead emphasized that she was an abuser of alcohol and prescription medications and that she was a "violent person" who had "mental health problems."

Based on our review of the record, even assuming that the trial court abused its discretion by admitting the complained-of evidence, we conclude that, in the context of the entire case against Baxter, any error in admitting the complained-of evidence did not have a substantial or injurious effect on the jury's verdict and did not affect Baxter's substantial rights. *See Macedo*, 629 S.W.3d at 240; *Haley*, 173 S.W.3d at 518; *see also Garcia*, 201 S.W.3d at 704 ("[T]here is no reason for us to believe that the jury had reasonable doubt that [the defendant] murdered [the victim] but convicted him anyway based on the [extraneous-offense] evidence."). Thus, we must disregard any

35

such error.  *See* Tex. R. App. P. 44.2(b).  Accordingly, we overrule Baxter's fourth, eighth, twelfth, sixteenth, twentieth, twenty-fourth, twenty-eighth, thirty-second, and thirty-fourth points.  And because we have held that the trial court did not abuse its discretion by admitting the complained-of evidence under Rules 403 and 404(b), we likewise hold that the trial court did not abuse its discretion by admitting this evidence under Articles 38.36(a) and 38.371.  *See Garcia*, 201 S.W.3d at 702; *Emich*, 2019 WL 311153, at *6.  We thus overrule Baxter's first point.

## 5.  Right to confrontation and hearsay

Baxter raises eight points complaining that the trial court's admission of certain evidence violated his right to confrontation under the Sixth Amendment of the United States Constitution and Article I, Section 10 of the Texas Constitution, and he also raises eight points complaining that such evidence was inadmissible hearsay.[21]  *See* U.S. Const. amend. VI; Tex. Const. art. I, § 10.  Specifically, he complains about the admission of the following evidence:

- Mary's written statement to Gonzalez (fifth and sixth points);

- Mary's recorded interview with Gonzalez (ninth and tenth points);

- A SafeHaven screening document describing Mary's March 16, 2018 call to the shelter (thirteenth and fourteenth points);

---

[21]In their respective briefs, both sides group their analysis of Baxter's right to confrontation points with his hearsay points, and we will do the same.

36

- Mary's responses to a domestic violence checklist (seventeenth and eighteenth points);

- Mary's outcry to Barletta and Mary's medical records (twenty-first and twenty-second points);

- Mary's statements to and text messages with Gonzalez (twenty-fifth and twenty-sixth points);

- Mary's text messages with Baxter (twenty-ninth and thirtieth points); and

- Mary's recorded conversation with Baxter on March 21, 2018, when she tried to leave him (thirty-fifth and thirty-sixth points).

The State counters by arguing that the trial court properly admitted the complained-of evidence under the doctrine of forfeiture by wrongdoing.

### a. Applicable law

In a criminal prosecution, a defendant has a Sixth Amendment right to confront adverse witnesses.[22] *Giles v. California*, 554 U.S. 353, 357–58, 128 S. Ct. 2678, 2682 (2008) (citing *Crawford v. Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 1374 (2004)). In a criminal prosecution, hearsay—defined as an out-of-court oral or written statement offered in evidence to prove the truth of the matter asserted in the

---

[22]As noted above, apart from claiming that his right to confrontation was violated under the Sixth Amendment to the United States Constitution, Baxter also claims that his right to confrontation was violated under Article I, Section 10 of the Texas Constitution. But because the Texas Constitution does not provide greater protections than does the United States Constitution, we will address these points under the confrontation rights guaranteed by the Sixth Amendment. *See Alfonso Luna v. State*, No. 02-18-00452-CR, 2019 WL 6767809, at *3 (Tex. App.—Fort Worth Dec. 12, 2019, no pet.) (mem. op., not designated for publication); *King v. State*, 189 S.W.3d 347, 361–62 (Tex. App.—Fort Worth 2006, no pet.).

statement—is inadmissible unless a statute or rule provides otherwise. Tex. R. Evid. 802; *see* Tex. R. Evid. 801(a), (d).

The United States Supreme Court has recognized, however, that certain exceptions exist that allow testimonial hearsay statements to be admitted even though the defendant has not had the opportunity to confront the declarant. *Giles*, 554 U.S. at 358, 128 S. Ct. at 2682. One such exception—referred to as the doctrine of forfeiture by wrongdoing—applies to declarations made by a declarant whose unavailability at trial was wrongfully procured by the defendant. *Id.* at 359, 128 S. Ct. at 2683. This doctrine is based on the principle that "any tampering with a witness should once [and] for all estop the tamperer from making any objection based on the results of his own chicanery." *Gonzalez v. State*, 195 S.W.3d 114, 117 (Tex. Crim. App. 2006). Without such a rule, there would be "an intolerable incentive for defendants to bribe, intimidate, or even kill witnesses against them." *Giles*, 554 U.S. at 365, 128 S. Ct. at 2686. "[T]he domestic-violence context is particularly suitable for the application of the forfeiture[-]by[-]wrongdoing doctrine." *Powell v. State*, No. 02-19-00206-CR, 2021 WL 5370163, at *72 (Tex. App.—Fort Worth Nov. 18, 2021, pet. ref'd) (mem. op. on reh'g, not designated for publication) (citing *Giles*, 554 U.S. at 377, 128 S. Ct. at 2693).

Article 38.49 of the Texas Code of Criminal Procedure is a codification of the forfeiture-by-wrongdoing doctrine. *See* Tex. Code Crim. Proc. Ann. art. 38.49. Article 38.49 provides that a defendant who "wrongfully procures the unavailability of

38

a witness or prospective witness . . . may not benefit from the wrongdoing by depriving the trier of fact of relevant evidence . . . [and] forfeits the party's right to object to the admissibility of evidence or statements based on the unavailability of the witness." *Id.* Article 38.49 requires the trial court to determine, outside the presence of the jury, "whether forfeiture by wrongdoing occurred by a preponderance of the evidence." *Id.* The evidence to be considered by the trial court in determining forfeiture by wrongdoing is "[e]vidence and statements related to a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of a witness." *Id.* The party offering evidence of wrongdoing is not required to show that "the actor's sole intent was to wrongfully cause the witness's or prospective witness's unavailability" or that the actions constituted a criminal offense or that any statements offered are "reliable." *Id.* Direct or circumstantial evidence may be used to show that the defendant's wrongful conduct caused a witness's unavailability. *See Brown v. State*, 618 S.W.3d 352, 357 (Tex. Crim. App. 2021) ("[C]ourts have recognized that procurement or causation need not be proven directly, but may be established by inference."); 23 Corpus Juris Secundum, Criminal Procedure and Rights of Accused § 1182 (2023) ("Circumstantial evidence may be used to establish, in whole or in part, that the witness's unavailability was procured by the defendant.").

Because the forfeiture-by-wrongdoing doctrine relates to the admission of otherwise objectionable evidence, we utilize the abuse of discretion standard in

reviewing a trial court's admission of evidence under that doctrine. *Barkley v. State*, No. 02-22-00081-CR, 2023 WL 2534465, at *8 (Tex. App.—Fort Worth Mar. 16, 2023, no pet.) (mem. op., not designated for publication); *Dobbins v. State*, No. 07-20-00095-CR, 2021 WL 2521564, at *3 (Tex. App.—Amarillo June 18, 2021, no pet.) (mem. op., not designated for publication).

### b. Inadequate briefing

In its brief, the State argues that, with the exception of Baxter's fifth and sixth points (concerning Mary's written statement to Gonzalez), he has inadequately briefed his other points that relate to his right to confrontation and hearsay. We agree.

With respect to his points relating to his right to confrontation and hearsay, Baxter gave a detailed analysis of those points only as it pertained to Mary's written statement to Gonzalez. Baxter argued that Mary's written statement to Gonzalez was "clearly testimonial," and he argued that he had been harmed by the admission of Mary's written statement. Baxter did not, however, analyze his right to confrontation and hearsay points as to the other complained-of evidence (i.e., Mary's recorded interview with Gonzalez, a SafeHaven screening document, Mary's responses to a domestic violence checklist, Mary's outcry to Barletta and Mary's medical records, Mary's statements to and text messages with Gonzalez, Mary's text messages with Baxter, and Mary's recorded conversation with Baxter), nor did he explain whether

40

and how any of that evidence was testimonial in nature.[23] Rather, Baxter simply incorporated the discussion he had made pertaining to Mary's written statement to Gonzalez into his argument relating to the other complained-of pieces of evidence. But a discussion of Mary's written statement has no bearing on the other complained-of evidence.

An appellant is required to present a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record. *See* Tex. R. App. P. 38.1. "A brief that fails to apply the law to the facts does not comply with Rule 38.1 and presents nothing for review." *Taylor v. State*, 558 S.W.3d 215, 218 (Tex. App.—Texarkana 2018, no pet.). Thus, we hold that Baxter has waived his right to confrontation and hearsay points other than those points relating to Mary's written statement to Gonzalez. *See Bradshaw v. State*, No. 01-19-00611-CR, 2020 WL 7062589,

---

[23]Some of the complained-of evidence—like Mary's medical records and her text messages with Baxter—is clearly not testimonial. *See Nash v. State*, No. 02-22-00165-CR, 2023 WL 5615807, at \*10 (Tex. App.—Fort Worth Aug. 31, 2023, no pet. h.) (mem. op., not designated for publication) (holding that text messages were not testimonial where they were not sent to law enforcement and their circumstances did not indicate that their primary purpose was to establish or prove past events potentially relevant to a later criminal prosecution); *Eslora v. State*, No. 04-04-00112-CR, 2005 WL 763233, at \*4 (Tex. App.—San Antonio Apr. 6, 2005, pet. ref'd) (mem. op., not designated for publication) (holding that medical records are not testimonial). Moreover, some of the complained-of evidence—like Mary's statements to Barletta and her text messages and recorded conversation with Baxter—likely falls within an exception to the hearsay rule. *See* Tex. R. Evid. 803(1), (2) (providing exception to hearsay rule for present sense impression and excited utterance); *Turner v. State*, 924 S.W.2d 180, 182 (Tex. App.—Eastland 1996, pet. ref'd) (holding that statements describing abusive acts are pertinent to medical diagnosis and treatment).

at *5 (Tex. App.—Houston [1st Dist.] Dec. 3, 2020, no pet.) (mem. op., not designated for publication) ("[B]ecause [the appellant] has neither identified which 911 calls were erroneously admitted and which statements were testimonial in nature (and thus violative of his Confrontation Clause rights), nor how he was harmed by the allegedly erroneous admission of these unidentified statements, we hold that [he] has waived this issue on appeal."); *Edmondson v. State*, 399 S.W.3d 607, 612 (Tex. App.—Eastland 2013, no pet.) (holding that appellant waived any complaint he may have had regarding his right to confrontation where his brief contained "only one conclusory sentence stating that both [complained-of] statements were 'testimonial in nature'" and his briefing on his right to confrontation lacked "discussion, or substantive analysis").

### c. Analysis

In his brief, Baxter argues that "[t]he evidence before the trial court was not sufficient to sustain the ruling on forfeiture by wrongdoing," pointing to evidence developed at trial that Mary had "a host of health issues," was "suicidal," and that the hydrocodone in Mary's system at the time of her death was at the "lethal level." But that analysis ignores the litany of evidence presented at the forfeiture-by-wrongdoing hearing that supported the trial court's ruling.

In this regard, the trial court conducted a hearing outside the presence of the jury to ascertain whether the forfeiture-by-wrongdoing doctrine applied to prevent Baxter from objecting to the admission of the complained-of evidence, including

Mary's written statement to Gonzalez. During that hearing, Gonzalez testified as follows about Baxter's abusive relationship with Mary:

- The North Richland Hills Police Department opened an investigation into Baxter after it received a report that he had abused Mary in March 2018.

- That same month, Gonzalez met with Mary, and she told him that she was being abused; that the abuse had started out with small things like "hair-pulling" but had escalated, with Baxter impeding her breath during the latest incident; that she was being forced to give sexual massages to customers; that Baxter had threatened to hurt one of her friends, to kill her pets, and to tell her family about the massage business; that Baxter had made "death threats"; and that she wanted to leave Baxter.

- Mary attempted to leave Baxter in March 2018, but he took her suitcase and refused to let her leave.

- Baxter had a tracker on Mary's phone.[24]

- Mary informed Gonzalez in early April 2018 that she was still planning on leaving Baxter, but Mary was nervous to leave because of threats made by Baxter, particularly after Baxter found out that Mary had reported the abuse.

- Baxter threatened to sue Barletta for making a false report to law enforcement.

- Later in April 2018, Mary told Gonzalez that she wanted to withdraw her statement because she was having a "hard time dealing with everything."

- Gonzalez attempted to continue her investigation, but Mary did not respond to Gonzalez's communications.

- Mary died in March 2019; the cause of Mary's death was asphyxiation by strangulation.

---

[24]Mary's written statement reflected that Baxter had also placed a tracking device on Mary's vehicle.

- When asked about causing Mary's death by strangulation, Baxter stated that he had "pushed her down and held her neck with one hand as he placed his body on her person."

At the conclusion of the forfeiture-by-wrongdoing hearing, the trial court made the following ruling:

> Based on what's been admitted during the course of this hearing, the Court finds, by a preponderance of the evidence, that this ongoing relationship that is described by the injured party in this case, the defendant did have some intent to wrongfully cause her to be unavailable, that she had gone to the police department before, that there's evidence in the statement that he had done a wrongful act, that is to strangle her, that's by a preponderance of the evidence that based on this ongoing controlling relationship, the previous report to the police, the multiple descriptions by Mary Baxter of the defendant tracking her phone, tracking her car, controlling her life, controlling her income, controlling her . . . that he has forfeited by wrongdoing his confrontation right of Mary Baxter, per these proffered exhibits that contain her statements, he has forfeited his right to object to hearsay, and that while these obviously are prejudicial, the probative value as provided by 38.371 to describe their relationship is extremely high and outweighs the prejudicial effect.
>
> And the Court finds that these are, based on these reasons, admissible in front of the jury.

Here, we conclude that the evidence presented at the hearing was sufficient for the trial court to find by a preponderance of the evidence that Baxter's actions were motivated, at least in part, to prevent Mary from leaving him and to cut short the criminal investigation against him pertaining to his 2018 assault of Mary. *See Schindler v. State*, No. 02-17-00241-CR, 2018 WL 4924946, at *3 (Tex. App.—Fort Worth Oct. 11, 2018, pet. ref'd) (mem. op., not designated for publication) ("[F]orfeiture by wrongdoing applies even when the defendant has multiple reasons for harming the

44

witness, as long as one of the reasons is to prevent the witness from testifying."). In this regard, the evidence reflected that a criminal investigation was started in March 2018 regarding the abuse, that Mary spoke to police regarding the abuse and that Baxter knew about it, that Mary wanted to leave Baxter, that Baxter threatened her and refused to let her leave, and that Baxter strangled Mary in March 2019. While the investigation regarding the March 2018 assault had been on hold for almost a year before Mary's death, the trial court could have reasonably determined that Baxter was still concerned about that investigation and that his motivation for killing Mary was, at least in part, due to his desire to make sure that Mary could not restart the investigation into that assault and other assaults. *See Brown*, 618 S.W.3d at 358 ("In a murder case, a prior history of family violence may show that the murder not only caused the victim's absence, but that it was designed to do so."); *Powell*, 2021 WL 5370163, at *74 ("[B]ecause the record reflects a connection between the abuse and the criminal charges, we conclude that the trial court did not abuse its discretion by admitting this evidence.").

We thus conclude that the trial court did not abuse its discretion by concluding that the State showed by a preponderance of the evidence that Baxter wrongfully procured Mary's unavailability at trial; accordingly, the trial court did not abuse its

discretion by admitting Mary's written statement to Gonzalez.[25]  *See Powell*, 2021 WL 5370163, at \*70 ("Under the doctrine of forfeiture by wrongdoing, a defendant is barred from asserting his right of confrontation or complaining about hearsay when he has wrongfully procured the witness's unavailability.").

### d. Harm

Even if we assumed that the trial court abused its discretion by admitting the complained-of evidence, the record does not establish harm.  Error in the admission of evidence in the violation of the right to confrontation is constitutional error.[26]  *See Langham v. State*, 305 S.W.3d 568, 582 (Tex. Crim. App. 2010).  Because the error is constitutional, Rule 44.2(a) requires us to reverse the conviction unless we determine beyond a reasonable doubt that the trial court's admission of the complained-of evidence did not contribute to the conviction.  *See* Tex. R. App. P. 44.2(a); *Wells v. State*, 611 S.W.3d 396, 410 (Tex. Crim. App. 2020).  "If there is a reasonable likelihood that the error materially affected the jury's deliberations, then the error was not harmless beyond a reasonable doubt."  *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000); *see also Neal v. State*, 256 S.W.3d 264, 284 (Tex. Crim. App. 2008).

---

[25]Our forfeiture-by-wrongdoing analysis would apply to the other complained-of evidence apart from Mary's written statement.  Thus, even if Baxter had not inadequately briefed those points, we would still overrule them.

[26]Error in the admission of hearsay is not constitutional error.  *See Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

Our harmless-error analysis should not focus on the propriety of the trial's outcome but rather should focus on whether the constitutional error adversely affected the integrity of the process leading to the conviction. *See Wells*, 611 S.W.3d at 410; *see also Wesbrook*, 29 S.W.3d at 119 ("[T]he appellate court should calculate as much as possible the probable impact of the error on the jury in light of the existence of other evidence."). To that end, we "should take into account any and every circumstance apparent in the record that logically informs an appellate determination whether 'beyond a reasonable doubt [that particular] error did not contribute to the conviction or punishment.'" *Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011) (quoting Tex. R. App. P. 44.2(a)). While the most significant concern must be the error and its effects, the presence of overwhelming evidence supporting the finding in question can be a factor in the evaluation of harmless error. *Wells*, 611 S.W.3d at 410.

After carefully reviewing the record and performing Rule 44.2(a)'s required harm analysis, we hold beyond a reasonable doubt that, even if the trial court had erred by admitting Mary's written statement to Gonzalez, the trial court's error did not contribute to Baxter's conviction. *See* Tex. R. App. P. 44.2(a). In this regard, the thrust of Mary's written statement—which detailed Baxter's abuse of her, his controlling nature, and his threats toward her—was described by other witnesses, most notably during Gonzalez's testimony; and, as we have already described in our harm analysis with respect to Rule 403, there was strong evidence indicating Baxter's

47

guilt for murder. *See Perry v. State*, No. 08-12-00285-CR, 2014 WL 3051020, at *4 (Tex. App.—El Paso July 3, 2014, no pet.) (not designated for publication) (holding that even if statements had violated right to confrontation, they were harmless given that they were largely cumulative of other testimony and due to strength of State's case). Thus, even if the trial court did abuse its discretion by admitting Mary's written statement to Gonzalez, Baxter was not harmed by the admission. We overrule Baxter's fifth, sixth, ninth, tenth, thirteenth, fourteenth, seventeenth, eighteenth, twenty-first, twenty-second, twenty-fifth, twenty-sixth, twenty-ninth, thirtieth, thirty-fifth, and thirty-sixth points.

## B. Baxter's complaint that the trial court should have granted his motion for mistrial

In his thirty-seventh point, Baxter complains that the trial court abused its discretion by denying his motion for mistrial that was based on the State's purported comment regarding his failure to testify at trial.

### 1. The complained-of comment

At the conclusion of Baxter's closing argument, Baxter's trial counsel alluded to the "State's story." Baxter's trial counsel told the jury,

> Their story -- State's story of strangulation just does not fit here. You have the evidence. You can take this evidence back and review it. You can look at the ME's report, the toxicology report, and you can see the high levels of drugs in Mary's system, all of them acting together to produce her untimely death. We're asking for a not guilty on all counts.

48

At the beginning of the State's rebuttal closing argument, a prosecutor responded to Baxter's argument regarding the "State's story." The prosecutor told the jury, "The State doesn't have a story. I don't get to sit over here and make up stories. I have to have evidence. I have to bring forth evidence for a jury to make a decision. The person who tells stories in this courtroom is Victor Baxter." Baxter's trial counsel objected on the grounds that the State was commenting on Baxter's failure to testify. The trial court sustained the objection, and it instructed the jury to disregard the prosecutor's comment. Baxter's trial counsel moved for a mistrial, which the trial court denied. The prosecutor continued her rebuttal closing argument:

> Since 2016, the defendant, through his letters to family, through his statements to medical professionals, through his statement to Detective Goen, through his story to police officers on scene, has said over and over again all of these things about Mary that we now know are not true. It's a story. It's a lie.[27]

On appeal, Baxter complains that the trial court abused its discretion by denying his motion for mistrial after the trial court sustained his objection to the prosecutor's comment, "The person who tells stories in this courtroom is Victor Baxter."

## 2. Standard of review and applicable law

When a trial court sustains an objection and instructs the jury to disregard improper argument but denies a defendant's motion for mistrial, the issue is whether

---

[27]Baxter did not object to these remarks during the prosecutor's continuation of her rebuttal closing argument.

the trial court abused its discretion by denying the mistrial. *Hawkins v. State*, 135 S.W.3d 72, 76–77 (Tex. Crim. App. 2004). A mistrial is required only in extreme circumstances: when the improper argument causes incurable prejudice—that is, the argument is "so prejudicial that expenditure of further time and expense would be wasteful and futile." *Id.* at 77 (quoting *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999)).

In determining whether a trial court abused its discretion by denying a mistrial, we balance the following three factors (often referred to as the *Mosley* factors): (1) the severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks), (2) the measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the trial court), and (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction). *Archie v. State*, 221 S.W.3d 695, 700 (Tex. Crim. App. 2007); *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g).

### 3. Analysis of the *Mosley* factors

#### a. The severity of the misconduct

To be permissible, the State's jury argument generally must fall within one of the following four general areas: (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to opposing counsel's argument, or (4) plea for law enforcement. *Freeman v. State*, 340 S.W.3d 717, 727 (Tex. Crim. App. 2011).

The State, however, may not allude to a defendant's decision to not testify. U.S. Const. amend. V; Tex. Const. art. I, § 10; Tex. Code Crim. Proc. Ann. art. 38.08. To determine if a prosecutor's comment impermissibly referred to the defendant's decision to not testify, a court must decide whether the language used was plainly intended or was of such a character that the jury naturally and necessarily would have considered it to be a comment on the defendant's decision to not testify. U.S. Const. amend. V; Tex. Code Crim. Proc. Ann. art. 38.08; *see Randolph v. State*, 353 S.W.3d 887, 891 (Tex. Crim. App. 2011); *Fuentes v. State*, 991 S.W.2d 267, 275 (Tex. Crim. App. 1999). The court must view the offending language from the jury's standpoint, and the implication that the comment referred to the defendant's decision to not testify must be clear. *Randolph,* 353 S.W.3d at 891. A merely indirect or implied allusion to the defendant's decision to not testify does not violate his right to remain silent. *Id.*

Notably, when a defendant makes a statement that is admitted into evidence, the State's reference to the statement and comparison between the statement and the other evidence collected is not a comment on the defendant's failure to testify or to his right to remain silent. *Garcia v. State*, 126 S.W.3d 921, 924 (Tex. Crim. App. 2004); *see Graves v. State*, No. 02-22-00100-CR, 2023 WL 2607642, at *7 (Tex. App.—Fort Worth Mar. 23, 2023, no pet.) (mem. op., not designated for publication) ("It would appear logical that when a defendant's statements are in evidence, it is fair game for the State to comment on those statements and not run afoul of the prohibition of commenting on the defendant's failure to testify.").

After reviewing the complained-of comment, we cannot say that it was plainly intended or was of such a character that the jury naturally and necessarily would have considered it to be a comment on Baxter's decision to not testify. *See Randolph*, 353 S.W.3d at 891. Indeed, the comment seems to be a direct response to the reference made during Baxter's closing argument regarding the "State's story." And as made clear by the prosecutor during the continuation of her rebuttal closing argument, her reference to the "stories" told by Baxter referred to statements made by him that were admitted into evidence—letters written by him and statements made by him to medical professionals and law enforcement. A reference to such statements admitted into evidence is not a comment on Baxter's failure to testify. *See Garcia*, 126 S.W.3d at 924 (holding that reference to defendant's statement already in evidence was not an improper comment on his failure to testify); *Lopez v. State*, 339 S.W.2d 906, 910 (Tex. 1960) (holding that prosecutor's comment that "this defendant has not told you all that happened on top of that hill" was a reference to the contents of defendant's written statement, which was evidence that had been admitted, and, thus, was not a comment on his failure to testify); *Graves*, 2023 WL 2607642, at *9 ("Here, Appellant does not contend that the State did anything in its closing arguments other than refer to and draw deductions from his prior statements. Those arguments were within the bounds of proper argument and do not constitute a comment on Appellant's exercise of his right not to testify.").

Thus, we do not think that the complained-of remark was an improper comment on Baxter's decision to not testify. And even if we assumed (as the trial court decided) that it was an improper comment, the severity of the misconduct would be weak. *See Aguilar v. State*, No. 02-18-00175-CR, 2018 WL 4140741, at *4 (Tex. App.—Fort Worth Aug. 30, 2018, pet. ref'd) (mem. op., not designated for publication) ("Assuming that the prosecutor's statement, 'Who else is it going to be?' could be construed as an improper comment on appellant's decision not [to] testify (as the trial court decided), we conclude that the trial judge did not abuse her discretion by denying the motion for mistrial."). This factor weighs in favor of the trial court's denial of Baxter's motion for mistrial.

### b. The measures adopted to cure the misconduct

Here, the trial court instructed the jury to disregard the complained-of comment by the prosecutor. The law generally presumes that instructions to disregard will be duly obeyed by the jury. *Wesbrook*, 29 S.W.3d at 116; *Whitney v. State*, 396 S.W.3d 696, 706 (Tex. App.—Fort Worth 2013, pet. ref'd) (mem. op.). And, generally, a trial court cures any error from improper jury argument when it instructs the jury to disregard the comment. *Wesbrook*, 29 S.W.3d at 115; *Whitney*, 396 S.W.3d at 706. We have found nothing in the record to suggest that the jury did not heed the trial court's instructions. Thus, this factor weighs in favor of the trial court's denial of Baxter's motion for mistrial. *See Spence v. State*, No. 02-16-00222-CR, 2017 WL 3526346, at *6 (Tex. App.—Fort Worth Aug. 17, 2017, pet. ref'd) (mem. op., not

53

designated for publication) (concluding that second *Mosley* factor weighed in favor of trial court's denial of mistrial where trial court instructed jury to disregard complained-of comment and "nothing in the record . . . suggest[ed] that the jury did not heed the trial court's instructions").

### c. The certainty of conviction absent the misconduct

Here, the evidence of Baxter's guilt was strong. The medical examiner noted that there were several factors indicating that Mary had died from asphyxia by strangulation, including the bruising to Mary's neck, the presence of petechiae, and the deep hemorrhaging to the structures within Mary's neck. It is undisputed that Mary and Baxter were the only individuals in the master bedroom of their home around the time of Mary's death, and the two of them had been in an argument the previous day regarding Mary's inability to return the adopted cat to the pet store, with pet store staff describing Baxter as "incredibly angry."

Moreover, Mary's body showed signs of recent abuse. Baxter's explanation for Mary's injuries—that she had "fallen into the door"—was inconsistent with her injuries. And during a later interview with Goen, Baxter stated that he had previously "put [Mary] down" by putting his hands around her neck. Further, Baxter's assurance that his CPAP machine would corroborate his statement that he was asleep from approximately 6:00 p.m. until he found Mary's body was belied by the records from the machine, which showed that the machine had less than two hours of usage on March 10, 2019, and no usage on March 11, 2019. Finally, law enforcement

responding to the scene noted that Baxter's demeanor was "very off"—that instead of seeming bereaved by Mary's death, he stressed that she was an abuser of alcohol and prescription medications and that she was a "violent person" who had "mental health problems." This factor weighs in favor of the trial court's denial of Baxter's motion for mistrial.

### d. Summary of the *Mosley* factors

In summary, each of the *Mosley* factors weighs in favor of the trial court's denial of Baxter's motion for mistrial. We thus hold that the trial court did not abuse its discretion by denying the motion. *See Lockett v. State*, No. 01-22-00302-CR, 2023 WL 4496919, at *5 (Tex. App.—Houston [1st Dist.] July 13, 2023, pet. ref'd) (mem. op., not designated for publication) (holding that, when viewing the *Mosley* factors together, the trial court did not abuse its discretion by denying the defendant's motion for mistrial where the complained-of comment was brief and isolated, the trial court instructed the jury to disregard the comment, and the evidence of guilt presented to the jury was compelling). We overrule Baxter's thirty-seventh point.

## IV. CONCLUSION

Having overruled Baxter's thirty-seven points, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  November 30, 2023

56

# ATTACHMENT - LIST OF BAXTER'S POINTS

## Point of Error One

The trial court abused its discretion by admitting relationship evidence under CCP 38.371 and CCP 38.36(a).

## Point of Error Two

The trial court erred by admitting relationship evidence under CCP 38.371 over Appellant's due process objection that 38.371 was unconstitutional as applied to him.

## Point of Error Three

The trial court abused its discretion by admitting the decedent's 12-page written statement in the guilt/innocence phase under the guise of relationship evidence that detailed extensive domestic violence episodes that were not relevant apart from character conformity.

## Point of Error Four

The trial court abused its discretion by admitting the decedent's 12-page written statement in the guilt/innocence phase under the guise of relationship evidence that detailed extensive domestic violence episodes and the minimal probity of this statement was substantially outweighed by the unfair prejudice.

## Point of Error Five

The trial court violated Appellant's Sixth Amendment and Article I, Section 10 Confrontation Clause right by admitting the decedent's 12-page written statement in the guilt/innocence phase.

## Point of Error Six

The trial court erred by admitting the decedent's 12-page written statement over Appellant's hearsay objection.

## Point of Error Seven

The trial court abused its discretion by admitting the decedent's recorded interview with an investigator in the guilt/innocence phase under the guise of relationship evidence that detailed extensive domestic violence episodes that were not relevant apart from character conformity.

## Point of Error Eight

The trial court abused its discretion by admitting decedent's recorded interview with an investigator in the guilt/innocence phase under the guise of relationship evidence that detailed extensive domestic violence episodes and the minimal probity of these episodes was substantially outweighed by the unfair prejudice.

## Point of Error Nine

The trial court violated Appellant's Sixth Amendment and Article I, Section 10 Confrontation Clause right by admitting the decedent's recorded interview with an investigator in the guilt/innocence phase.

## Point of Error Ten

The trial court erred by admitting the decedent's recorded interview with an investigator in the guilt/innocence phase over Appellant's hearsay objection.

## Point of Error Eleven

The trial court abused its discretion by admitting an abuse victim shelter home screening in the guilt/innocence phase under the guise of relationship evidence that detailed extensive domestic violence episodes that were not relevant apart from character conformity.

## Point of Error Twelve

The trial court abused its discretion by admitting an abuse victim shelter home screening in the guilt/innocence phase under the guise of relationship evidence that detailed extensive domestic violence episodes and the minimal probity of these episodes was substantially outweighed by the unfair prejudice.

## Point of Error Thirteen

The trial court violated Appellant's Sixth Amendment and Article I, Section 10 Confrontation Clause right by admitting an abuse victim shelter home screening in the guilt/innocence phase.

## Point of Error Fourteen

The trial court erred by admitting an abuse victim shelter home screening in the guilt/innocence phase over Appellant's hearsay objection.

## Point of Error Fifteen

The trial court abused its discretion by admitting the decedent's responses to a domestic violence checklist in the guilt/innocence phase under the guise of relationship evidence that detailed extensive domestic violence episodes that were not relevant apart from character conformity.

## Point of Error Sixteen

The trial court abused its discretion by admitting a domestic violence checklist in the guilt/innocence phase under the guise of relationship evidence that detailed extensive domestic violence episodes and the minimal probity of these episodes was substantially outweighed by the unfair prejudice.

## Point of Error Seventeen

The trial court violated Appellant's Sixth Amendment and Article I, Section 10 Confrontation Clause right by admitting a domestic violence checklist in the guilt/innocence phase.

## Point of Error Eighteen

The trial court erred by admitting a domestic violence checklist in the guilt/innocence phase over Appellant's hearsay objection.

## Point of Error Nineteen

The trial court abused its discretion by admitting the decedent's outcry to a nurse practitioner and medical records of the treatment in the guilt/innocence phase under the guise of relationship evidence that detailed extensive domestic violence episodes that were not relevant apart from character conformity.

## Point of Error Twenty

The trial court abused its discretion by admitting the decedent's outcry to a nurse practitioner and medical records of the treatment in the guilt/innocence phase under the guise of relationship evidence that detailed extensive domestic violence episodes and the minimal probity of these episodes was substantially outweighed by the unfair prejudice.

## Point of Error Twenty-one

The trial court violated Appellant's Sixth Amendment and Article I, Section 10 Confrontation Clause right by admitting the decedent's outcry to a nurse practitioner and medical records of the treatment in the guilt/innocence phase.

## Point of Error Twenty-two

The trial court erred by admitting the decedent's outcry to a nurse practitioner and medical records of the treatment over Appellant's hearsay objection.

## Point of Error Twenty-three

The trial court abused its discretion by admitting the decedent's statements to and texts with an investigator in the guilt/innocence phase under the guise of relationship evidence that detailed extensive domestic violence episodes that were not relevant apart from character conformity.

## Point of Error Twenty-four

The trial court abused its discretion by admitting the decedent's statements to and texts with an investigator in the guilt/innocence phase under the guise of relationship evidence that detailed extensive domestic violence episodes and the minimal probity of these episodes was substantially outweighed by the unfair prejudice.

## Point of Error Twenty-five

The trial court violated Appellant's Sixth Amendment and Article I, Section 10 Confrontation Clause right by admitting the decedent's statements to and texts with an investigator in the guilt/innocence phase.

## Point of Error Twenty-six

The trial court erred by admitting the decedent's statements to and texts with an investigator in the guilt/innocence phase over Appellant's hearsay objection.

## Point of Error Twenty-seven

The trial court abused its discretion by admitting the decedent's texts with Appellant in the guilt/innocence phase under the guise of relationship evidence that detailed extensive domestic abuse that was not relevant apart from character conformity.

## Point of Error Twenty-eight

The trial court abused its discretion by admitting the decedent's texts with Appellant in the guilt/innocence phase under the guise of relationship evidence that detailed extensive domestic abuse and the minimal probity of this abuse was substantially outweighed by the unfair prejudice.

## Point of Error Twenty-nine

The trial court violated Appellant's Sixth Amendment and Article I, Section 10 Confrontation Clause right by admitting the decedent's texts with Appellant in the guilt/innocence phase.

## Point of Error Thirty

The trial court erred by admitting the decedent's texts with Appellant in the guilt/innocence phase over Appellant's hearsay objection.

## Point of Error Thirty-one

The trial court abused its discretion by admitting photographs of injuries from prior abuse in the guilt/innocence phase under the guise of relationship evidence that detailed extensive domestic violence episodes that were not relevant apart from character conformity.

## Point of Error Thirty-two

The trial court abused its discretion by admitting photographs of injuries from prior abuse in the guilt/innocence phase under the guise of relationship evidence that detailed extensive domestic violence episodes and the minimal probity of these episodes was substantially outweighed by the unfair prejudice.

## Point of Error Thirty-three

The trial court abused its discretion by admitting the decedent's recorded conversation with the Appellant in the guilt/innocence phase under the guise of relationship evidence that detailed extensive domestic abuse that was not relevant apart from character conformity.

## Point of Error Thirty-four

The trial court abused its discretion by admitting the decedent's recorded conversation with the Appellant in the guilt/innocence phase under the guise of relationship evidence that detailed extensive domestic abuse and the minimal probity of the abuse was substantially outweighed by the unfair prejudice.

## Point of Error Thirty-five

The trial court violated Appellant's Sixth Amendment and Article I, Section 10 Confrontation Clause right by admitting the decedent's recorded conversation with the Appellant in the guilt/innocence phase.

## Point of Error Thirty-six

The trial court erred by admitting the decedent's recorded conversation with the Appellant in the guilt/innocence phase over Appellant's hearsay objection.

## Point of Error Thirty-seven

The trial court erred by failing to grant a mistrial after improper jury argument that commented on the Appellant's failure to testify.